**Marc P. Berger**
**Lara S. Mehraban**
**Kevin P. McGrath**
**Alison R. Levine**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281**
**(212) 336-5549 (Levine)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                        :

**SECURITIES AND EXCHANGE**    :
**COMMISSION,**    :     **18-cv-  (     )**
    :
            **Plaintiff,**    :     **COMPLAINT**
    :
         - against -    :     **ECF CASE**
    :
**JOHN GERACI,**    :
    :
          **Defendant.**    :     **JURY TRIAL**
    :     **DEMANDED**
-------------------------------------------------------- x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendant John Geraci ("Defendant" or "Geraci"), alleges as follows:

## SUMMARY

1.     From approximately June 2015 through September 2016 (the "Relevant Period"),

Geraci engaged in a scheme to defraud prospective investors and his clients through a new fund

he created in March 2015, the Meridian Matrix Long Short Equity Fund, LP (the "Meridian

Matrix Fund").  Geraci perpetrated his scheme by: (1) making materially false and misleading

statements and omissions about the Meridian Matrix Fund; (2) engaging a portfolio manager for

the Meridian Matrix Fund who lied about his past investment performance and who

misappropriated approximately $800,000 of investor funds; and (3) stealing approximately $1 million from the first clients who invested in that fund based on misrepresentations.

2.      Geraci disseminated materially false and misleading information to prospective investors, including claiming that the Meridian Matrix Fund and/or its portfolio manager, Matrix Capital Markets, LLC ("Matrix"), had tens of millions of dollars in assets under management ("AUM") and a successful trading track record, earning profits ranging from 19% to 66% between 2012 and 2015.

3.      In reality, Geraci knew, recklessly disregarded, and/or should have known that neither the Meridian Matrix Fund nor Matrix had any AUM or trading history prior to September 2015 and that the claimed trading profits were pure fiction.

4.      Based on Geraci's false and misleading representations and omissions, a married couple from Alabama (the "Clients" or "Client A" and "Client B"), for whom Geraci acted as an investment adviser, gave Geraci $2 million to invest in the Meridian Matrix Fund on their behalf.

5.      The Clients were the only investors in the Meridian Matrix Fund. After the Clients invested in the Meridian Matrix Fund, Geraci made additional material misrepresentations about the performance of the Meridian Matrix Fund to them.

6.      Specifically, Geraci sent the Clients false account statements purportedly reflecting the Meridian Matrix Fund's monthly performance and the Clients' profits from this $2 million investment. Geraci knew when he sent these statements that Matrix's portfolio manager – Nicholas Mitsakos ("Mitsakos") – had already misappropriated approximately $800,000 of the Clients' $2 million investment.

7.      Between November 2015 and July 2016, Meridian received approximately $1.1 million of the Clients' remaining money back from Mitsakos and Matrix. But instead of

returning this money to the Clients and informing them that Mitsakos had misappropriated the rest, Geraci himself misappropriated approximately $1 million of it.  He spent this money on Meridian's business expenses as well as his own personal expenses, including paying for a BMW, a gym membership, and his credit card bills.

8.     In September 2016, shortly after the Commission and the U.S. Attorney's Office for the Southern District of New York ("USAO") filed separate actions charging Mitsakos (and, in the case of the Commission, Matrix) with fraud in connection with these events, Geraci lied to his Clients, telling them that it was Mitsakos who had lost all of their money.

## VIOLATIONS

9.     By engaging in the conduct set forth in this Complaint, Geraci has violated and, unless enjoined, will continue to violate Sections 17(a)(1), (2), and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), (2), and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)] and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 15(b), 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77o(b), 77t(b), 77t(d), and 77v(a)], Sections 20(e), 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78t(e), 78u(d), 78u(e), and 78aa], and Sections 209(d), 209(e), 209(f) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-9(f) and 80b-14].

11.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  For instance, during the Relevant Period, Geraci sent false and misleading statements into Manhattan by email; made false or misleading statements to prospective investors and financial services institutions in Manhattan; and misappropriated funds from an account held at an investment management firm (the "Investment Management Firm") based in Manhattan.

12.     Geraci, directly or indirectly, used means or instrumentalities of interstate commerce, of the mails, and/or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

### DEFENDANT

13.     **Geraci**, age 61, is a resident of Florida.  He was a shareholder, director, and founder of Meridian and was a director of the Meridian Matrix Fund.

### OTHER RELEVANT ENTITIES AND INDIVIDUALS

14.     **Meridian** was formed in the Cayman Islands in September 2012.  In 2015, Meridian's website claimed that it was an "Asset Manager and Private Merchant Banking Group led by senior professionals with over 100 years of combined experience in the securities, derivatives, insurance, private equity and hedge fund industries."  Meridian was the Investment Manager of the Meridian Global Opportunities Fund SPC ("Meridian Global"), a Cayman Islands exempted segregated portfolio company, and also served as the Investment Manager to

the Meridian Matrix Fund.  In March 2015, Meridian appointed Matrix (an investment adviser run by Mitsakos) to be the portfolio manager and sub-advisor to the Meridian Matrix Fund.

15. **The Meridian Matrix Fund** was formed in March 2015 as a segregated portfolio of Meridian Global, and was registered with the Cayman Islands Monetary Authority ("CIMA") as a regulated fund.  Investor shares in the fund were supposed to be offered to non-U.S. investors pursuant to a Confidential Private Placement Memorandum ("PPM") dated March 2015, but Geraci offered shares to U.S. investors as well.  The Meridian Matrix Fund was managed by Meridian, who in turn appointed Matrix as the Meridian Matrix Fund's Portfolio Manager and sub-adviser.  According to the PPM, the Meridian Matrix Fund offered "Investor Shares in Classes denominated USD to be issued to selected investors . . .: Class A1 USD Investor Shares  . . . [and] Class A2 USD Investor Shares . . ."  The proceeds of issuance of the shares of the Meridian Matrix Fund were to be "invested, reinvested, and applied for the benefit of that Segregated Portfolio only . . . ."  The "Investment Strategy" of the Meridian Matrix Fund was to "invest primarily in equity and equity-related securities which are listed on exchanges and markets in the United States."

16. **Mitsakos**, age 59, was a resident of California, and was the founder, Chairman, Chief Executive Officer ("CEO"), and Chief Investment Officer of Matrix.
On August 11, 2016, the Commission filed a civil action in the United States District Court for the Southern District of New York against Mitsakos and Matrix in SEC v. Matrix Capital Markets, LLC et al., Civil Action No. 16-cv-6395 (S.D.N.Y.).

17. **Matrix** was a Delaware limited liability company whose principal place of business was in San Francisco, California.  Matrix was an investment adviser that was registered with California from approximately October 2015 through March 2017.  Matrix purported to

have been managing at least one fund (the "Purported Matrix Fund") and/or a separately

managed account since approximately January 2012.  Matrix's registration as an investment

adviser in California was revoked in March 2017.

18.     **The Clients** are residents of Alabama.  In approximately August 2015, the

Clients, through their wholly-owned company ("Company A"), gave Geraci, through Meridian,

approximately $2 million to invest in the Meridian Matrix Fund.

## FACTS

**I.      Matrix and the Meridian Matrix Fund**

### A.  Background

19.     Geraci formed Meridian in approximately 2012, purportedly to provide

"innovative financial solutions to both our investors and corporate clients."

20.     In early 2015, Geraci was introduced to Mitsakos.  Mitsakos represented himself

in marketing materials to be an experienced hedge fund manager with "over 25 years of

investing experience, managing over $3 billion in global private and public equity investments,"

who had received an MBA from Harvard and started his career at Goldman Sachs.

21.     On or about February 25, 2015, Mitsakos sent Geraci a presentation outlining

Matrix's investment strategy as well as a Matrix Capital factsheet (the "Matrix Newsletter")

dated January 15, 2015, which reflected that Matrix had achieved annual returns of 25.4% in

2012, 66.3% in 2013, and 19.4% in 2014.  The Matrix Newsletter stated "Matrix Capital is

pleased to report our three year performance, net of fees, has exceeded all major indices."  It also

stated that a Big Four accounting firm was its auditor.  At the time, Geraci did not verify that

Matrix's purported annual returns were accurate, that they had been audited, or that the

Purported Matrix Fund had any AUM.

22.     Despite conducting only minimal due diligence on Mitsakos, Geraci agreed to enter into a joint business venture with him.  Geraci agreed to form the Meridian Matrix Fund and help Mitsakos raise money for that fund, and Mitsakos agreed to manage the investor money.

23.     In approximately March 2015, Meridian's directors formed the Meridian Matrix Fund as a segregated portfolio of Meridian Global.  That same month, Meridian (through Geraci) and Matrix (through Mitsakos) entered into a series of agreements outlining their joint venture.

24.     For example, in or about March 2015, Meridian and Matrix entered into a Portfolio Management Agreement ("PMA") whereby Meridian appointed Matrix to be the portfolio manager and sub-adviser for the Meridian Matrix Fund.

25.     On or about March 23, 2015, Meridian and Matrix entered into a Relationship Agreement which, among other things, set forth the management and performance fees that Meridian would pay Matrix as the portfolio manager.

**B.  Geraci Pitches an Investment in the Meridian Matrix Fund to the Clients**

26.     In the summer of 2015, Geraci and other Meridian associates began trying to raise capital for the Meridian Matrix Fund by contacting prospective investors in the U.S. and abroad. They did this using Matrix's purported historical performance results that Mitsakos provided and other promotional materials that they created themselves.

27.     One such prospective investor was Client A, who Geraci met in approximately May 2015.  Client A and Client B had generated more than $2 million in profits in the prior year through their company, Company A, and were looking for investment opportunities.  Geraci held himself and Meridian out to be experienced asset managers who could help the Clients invest and grow their money.

28.     That summer, Client A met with Geraci in person on several occasions to discuss various investment opportunities, including investing in the Meridian Matrix Fund.  Geraci proposed that the Clients invest in the Meridian Matrix Fund and sent Client A marketing materials regarding the fund's purported performance.

29.     For example, on July 6, 2015, Geraci sent an email to Client A entitled "Performance for the Meridian Matrix Fund" and wrote "[E]nclosed the performance YTD and the 3 yr."  He attached a two-page Matrix Newsletter, which contained information about, among other things, Matrix's: (1) purported historical monthly and annual performance, (2) top five long and short positions, and (3) administrator and auditor.  This particular Matrix Newsletter claimed annual returns of 25.4% in 2012; 66.3% in 2013; 19.4% in 2014; and 11.4% YTD in 2015.

30.     On July 6, 2015, Client A flew to Miami to meet with Geraci in person, where, over the next several days, they discussed the Meridian Matrix Fund.  In order to induce the Clients to invest in the Meridian Matrix Fund, Geraci told Client A that he had started the Meridian Matrix Fund with Mitsakos in approximately 2012, that this fund had extraordinary performance results over the past three years, and that it had tens of millions of dollars in AUM. Geraci said that other large investors were interested in investing in the fund, including Financial Institution A.

31.     Geraci knew that the information he provided to Client A about the Meridian Matrix Fund was false: it was a new fund with no investors, no performance history, and no brokerage or auditor relationships.  Geraci knew, was reckless in not knowing, and/or was at least negligent in not knowing, that the information was also false as to Matrix because he had only met Mitsakos a few months earlier and did not verify any of the information Mitsakos

provided to him.  Indeed, Mitsakos' outsized returns trading stocks – all of which exceeded the performance of common benchmarks like the S&P 500 by significant margins – would have led a reasonable person to ask for additional supporting information.  Had he done so, he would have learned that Matrix did not have any AUM or trading history from 2012 to this point in time in 2015.

32.     Nonetheless, Geraci advised Client A to invest $2 million in the Meridian Matrix Fund and said that, within a year, it would grow to between $2.5 and $2.8 million.

**C.     The Clients' Investment in the Meridian Matrix Fund**

33.     Ultimately, Geraci convinced Client A to permit Geraci to manage the Clients' money.  Based on Geraci's false representations regarding the Meridian Matrix Fund, the Clients agreed to give Geraci $2 million to invest in that fund.

34.     Instead of giving the Clients a subscription agreement for the Meridian Matrix Fund, however, Geraci proposed that the investment be structured ostensibly as a loan from Company A to Meridian for $1.4 million and $600,000 in management fees so that the Clients could write off the $600,000 as a "business expense" for tax purposes.  Geraci assured Client A that he and Client B would still receive $2 million worth of shares in the Meridian Matrix Fund and 100% of the profits that the fund made based on their $2 million investment.

35.     Geraci also charged the Clients a $60,135 fee for his advisory services, including for placing them into the Meridian Matrix Fund and setting up a trust for the Clients into which future profits from the Meridian Matrix Fund would be placed.

36.     On or about August 19, 2015, at Geraci's direction, the Clients caused Company A to enter into two agreements with Meridian.  The first agreement was an engagement letter (the "Engagement Letter"), backdated to January 1, 2015, from Geraci to Client B, whereby

Company A agreed to engage Meridian as a "strategic financial advisor for [Company A's] expansion."

37.     The second agreement was a "Master Loan and Pledge Agreement" ("MLPA"), under which Company A agreed to lend Meridian $1.4 million for three years in exchange for fixed interest of 5% per year.  Pursuant to the MLPA, upon closing, Company A transferred $2 million to Meridian and Meridian "pledges, and assigns to the Lender, and hereby transfers to the Lender all right, title, ownership and interest in . . . $2,000,000 of shares of the [Meridian Matrix Fund]" as "Pledged Collateral" to Company A.

38.     At Geraci's direction, on August 21, 2015, the Clients caused Company A to wire $600,000 for "Fee Agreement" and $1,400,000 for "Loan Proceeds" to Meridian.

39.     On August 26, 2015, at Geraci's direction, the Clients caused Company A to wire Meridian an additional $60,135 for "Fee Agreement" to Meridian.

40.     Contrary to how the deal was papered, however, Geraci provided verbal and written assurances to the Clients that they were investing in the Meridian Matrix Fund, not giving Meridian a loan.  For example, on July 6, 2015, Geraci explained to Client A in an email that the management fee for the Meridian Matrix Fund was 2% and the performance fee was 20% of net profits.  On August 20, 2015, Client A texted Geraci:  "Once I wire the funds how long will it take to be transferred to the fund your [sic] putting me in?" Several days later, on August 25, 2015, Geraci texted Client A that the Clients would be invested in the fund within a few days.

41.     Geraci also sent Client A three account statements reflecting the Meridian Matrix Fund's purported monthly performance results and Company A's total balance, including profits,

for October, November, and December 2015.  Moreover, the Clients never received, or sought payments of, the annual 5% interest payment ostensibly due to them under the MLPA.

42.     On or about August 31, 2015, Meridian executed and delivered a signed "Subscription Agreement" for $2 million of shares in the Meridian Matrix Fund to the fund's Administrator in the Cayman Islands.  Approximately one week later, Meridian transferred $1,993,500 from an account in its own name into an account in the Meridian Matrix Fund's name for the "subscription to the [Meridian Matrix Fund]."

43.     On or about September 18, 2015, Geraci and Meridian's other directors authorized the Meridian Matrix Fund's Administrator to transfer approximately $2 million to an account at Financial Institution A for Mitsakos and Matrix to manage on the Meridian Matrix Fund's behalf, which the Administrator did.

44.     Shortly thereafter, however, Mitsakos transferred $1.2 million to a first-loss capital account (the "FLCA") held at the Investment Management Firm in Matrix's name, not in the Meridian Matrix Fund's name.  Mitsakos thereafter used those funds to trade securities.  Specifically, from approximately October 2015 through June 1, 2016, Mitsakos and Matrix traded more than 1.4 million shares in more than 60 different companies publicly-traded in the U.S.

45.     Mitsakos did not invest the remaining $800,000 of the investor funds.  Instead, he misappropriated the majority of the remaining funds to pay various personal and business expenses, including legal bills, credit cards, rent for his home, payments for his Mercedes, and other unauthorized personal and business expenses.

### D. Geraci Learns that Mitsakos Misappropriated the Clients' Funds and Lied About Having a "Fund"

46.     In November 2015, the Investment Management Firm sent Geraci an account statement reflecting that Mitsakos had invested only $1.2 million of the $2 million in the FLCA. The statement also showed that Mitsakos had set up the FLCA in the name of "Matrix Capital" rather than the "Meridian Matrix Fund."

47.     In early December 2015, Financial Institution A sent Geraci an account statement also in the name of Matrix Capital, which reflected that Mitsakos had spent hundreds of thousands dollars to pay legal bills, credit cards, rent, his Mercedes payment, and other unauthorized personal and business expenses.

48.     Thus, by no later than early December 2015, Geraci knew that Mitsakos had:  (1) improperly diverted the Meridian Matrix Fund's assets an account in the name of Matrix Capital (instead of the name of the fund) over which Mitsakos had sole control; and (2) misappropriated hundreds of thousands of dollars of the Meridian Matrix Fund's money (specifically, the Clients' money as there were no other investors in the fund) to pay for his unauthorized personal and business expenses.

49.     On or about December 18, 2015, at an in-person meeting in New York City, Geraci and a Meridian associate confronted Mitsakos in person and demanded that he pay back the funds he had misappropriated and put the investor funds into an account in the name of the Meridian Matrix Fund.  Geraci did not, however, seek to terminate Mitsakos' or Matrix's roles as portfolio manager and sub-advisor to the Meridian Matrix Fund.

50.     Mitsakos subsequently agreed that he would change the account names holding the Clients' funds to the Meridian Matrix Fund and that he would reimburse Meridian for the

cash used by him and Matrix, which, according to Mitsakos, amounted to just under $800,000 at that time.

51.     On January 7, 2016, Matrix returned $200,000 to Meridian.  Mitsakos subsequently asked Geraci if he could pay him back the remaining misappropriated funds in shares of the Purported Matrix Fund.

52.     On or about January 13, 2016, an attorney representing Mitsakos told Geraci that Mitsakos had no "fund" and that he had never had a "fund."  Mitsakos then offered Geraci an unsecured promissory note backed by Matrix Capital, which had no fund and no capital.  The note would be repayable out of money that was earned by Matrix for business Geraci and Mitsakos generated through the Meridian Matrix Fund.

53.     Mitsakos subsequently admitted to Geraci that he did not have a "fund," but claimed that he did have a separately managed account ("SMA") with approximately $15 million in it.  This was also a false statement.  Mitsakos had no SMA with $15 million in AUM or indeed any money in AUM.

54.     Mitsakos did not produce to Geraci any backup data for the performance results he touted from 2012-2015, claiming that the files had become corrupted.

55.     In an email dated January 20, 2016, Mitsakos promised Geraci that he would pay back the Meridian Matrix Fund's money, and that his "intention [was] to make this [joint venture] very successful."  Mitsakos proposed that the best way to pay the fund's money back was via fees from Prospective Investor A, with whom Mitsakos, Geraci, and other Meridian associates had recently begun discussions regarding a joint investment involving Matrix.

56.     On or about February 29, 2016, Geraci caused Meridian to enter into a Share Redemption Agreement with the Meridian Matrix Fund whereby Meridian returned its $2

million shares in the Meridian Matrix Fund.  Meridian also obtained full ownership and control

over the remaining monies in the FLCA, as well as $214,000 held in a fund bank account and the

right to any other monies the Meridian Matrix Fund was able to recover from Matrix.  As part of

the redemption process, on or about March 18, 2016, Mitsakos entered into an agreement with

the Investment Management Firm granting Meridian access to and control over the funds in the

FLCA.

57.     Despite learning about Mitsakos' misdeeds, Geraci continued to allow Mitsakos

to trade the monies remaining in the FLCA.  Mitsakos' trading, however, was not successful and

he caused substantial trading losses in certain months.

### E. Geraci Makes Additional Materially False Statements and Omissions to His Clients

58.     By no later than March 2016, Geraci knew that Mitsakos:  (1) had

misappropriated $800,000 of the Meridian Matrix Fund's assets; (2) had lied about having a

"fund;" (3) could not afford to pay back the fund's money; and (4) was unable to provide backup

trading records for Matrix or SMA's purported 2012-2015 performance history.  Nonetheless,

Geraci continued to provide false performance updates to the Clients regarding their investment

in the Meridian Matrix Fund through approximately September 2016.

59.     For example, on December 23, 2015, Geraci sent Client A a "Statement of

Account" from Meridian, dated November 31, 2015, and wrote "as you can see [Mitsakos] has

continued his streak."  The November statement reflected that Mitsakos had earned $86,200.90

from "November performance," and Company A's account balance was $2,205.720.90.  But by

this time, Geraci knew that Mitsakos had misappropriated $800,000 of the $2 million the Clients

had invested and that the true account balance was closer to $1.2 million.

60.     Similarly, on January 19, 2016, Geraci sent Client A an account statement dated December 31, 2015 falsely stating that Company A's account balance was $2,217,930.00.

61.     Over the next few months, Geraci provided Client A with false updates on the Meridian Matrix Fund's purported performance via text message, claiming that it was too much work to send Company A's account statements.  For example, on February 25, 2016, Client A texted Geraci:  "Nick still going strong for the month.  We need a BIG one!!"  Geraci replied via text:  "Up about 4% right now."  This statement was misleading because:  (1) Geraci appeared to be talking about the Meridian Matrix Fund's performance, which never generated sufficient profits to match the percentage value conveyed to Client A; and (2) this figure did not take into account the $800,000 Mitsakos had misappropriated from the fund.

62.     In early June 2016, Geraci terminated his relationship with Mitsakos and caused all of the positions in the FLCA to be liquidated.  He subsequently transferred the remaining funds in that account – approximately $400,000 – to Meridian.

63.     On or about June 16, 2016, Geraci sent Mitsakos a "Demand and Offer of Settlement" letter, whereby Meridian demanded that Mitsakos and Matrix return all funds "wrongfully expropriated by [Mitsakos] from the [Meridian Matrix] Fund," and offered to resolve and settle all issues between them if Mitsakos would pay $800,000 to Meridian.

64.     Notwithstanding these demands to replace the stolen investor money, Geraci continued to provide fictitious updates to Client A about his investment in the Meridian Matrix Fund.  For example, on June 24, 2016, Geraci texted Client A:  "Up 8k today."  Several days later, on June 27, 2016 and June 29, 2016, Geraci reported:  "Down 11k" and "Up 12.7k yesterday" respectively.  On July 6, 2016, Client A texted Geraci:  "How did we end up for June."  Geraci replied:  "+7100 . . . Had two down days in a row."  Client A replied:  "Do you

know what my total amount is now."  Geraci replied:  "2,147,000 approximately…. The last 3 years Nick made most of his money in July and August."  On July 19, 2016, Geraci told Client A the fund was "up 167k for the month."  On August 4, 2016, Geraci told Client A that Mitsakos had made more than $122,000 in July.

65.     These performance results appear to have been completely made up because as of June 1, 2016, Mitsakos had ceased trading in the FLCA.

66.     In breach of his fiduciary duty to the Clients, at no point prior to September 2016 did Geraci tell the Clients that Mitsakos had stolen part of their money, that Mitsakos had no "fund," or anything else to indicate that there was an issue with their investment.

**II.     Geraci's Misuse of the Clients' Assets**

67.     Bank records reflect that from approximately November 2015 through July 2016, Meridian received approximately $1,132,336 of the original $2 million investment back from Mitsakos and Matrix.  Mitsakos misappropriated the remaining funds or lost them through trading losses and fees.

68.     Between November 2015 and November 2016, Geraci proceeded to spend nearly all of the returned investor money on Meridian's business expenses and his own personal expenses.

69.     Specifically, Geraci transferred a total of $320,745 to a Wells Fargo account in the name of Meridian Asset Capital Ventures, which he owns and controls.  Geraci used the entirety of these funds to pay for personal expenses, including for BMW payments, a gym membership, gas, groceries, trips, cell phone bills, and other family-related expenses.  Geraci used the remaining money to pay various Meridian employees or associates, legal fees, and other Meridian vendors, and to make other investments for his own benefit.

16

70.     In April 2016, Geraci made one partial redemption payment of $100,000 to the

Clients at their request.

71.     Geraci put off all of Client A's subsequent redemption requests.  For example, in

early September 2016, Client A told Geraci he needed $800,000 from the Meridian Matrix Fund

to pay his taxes, for which he had already received an extension.  Geraci did not return this

money to Client A.

72.     On or about September 20, 2016, Geraci called Client A and said that he had "bad

news," that Mitsakos had lost his entire investment, and that Geraci, too, was a victim of

Mitsakos' fraud.  As evidence of this, Geraci pointed Client A to the Commission's and the

USAO's actions against Mitsakos.  This too was a lie.  In fact, Geraci had received over $1.1

million back from Mitsakos and Matrix, and he had helped to perpetrate Mitsakos' fraud.

73.     Over the next several months, Geraci continued to tell Client A that he would pay

him back the money as soon as he sold certain "assets," but to date he has not done so.

III.    **Geraci's Additional Material Misrepresentations and Omissions**

74.     In addition to the material misrepresentations and omissions that Geraci made to

the Clients set forth above, between September 2015 and September 2016, Geraci made

numerous material misrepresentations and omissions to other U.S. and non-U.S. prospective

investors regarding the Meridian Matrix Fund and Matrix.  These discussions took place on the

telephone, at in person meetings, and via email, and occurred both before and after Geraci knew

that Mitsakos had committed fraud and lied about having a "fund."  Geraci primarily worked

from Miami, Florida, and had meetings with prospective investors in Miami and New York City.

75.     In the first half of 2015, when Geraci first pitched an investment in the Meridian

Matrix Fund to prospective investors in the U.S. and abroad, he made material

misrepresentations and omissions about its performance history, AUM, and brokerage and auditor relationships.  He did this by conflating the Meridian Matrix Fund and the Purported Matrix Fund in order to make it appear as though the Meridian Matrix Fund was well-established and had a long and successful track record.

76.     For example, on September 22, 2015, Geraci sent to a prospective U.S. investor – Prospective Investor A – an email enclosing "the latest information about the Matrix Long Short Fund for QIB's in the US and the Meridian Matrix Long Short Equity Fund SP, Cayman for non US investors."  Geraci attached to the email a "Meridian Long Short Equities Fund SP Factsheet" that he helped to create.  This document essentially cut and pasted the information contained in an August 2015 Matrix Newsletter from Mitsakos – including about past performance of 20.9% - 66.3% between 2012 and August 2015 – into a document under a "Meridian Asset Management" header.  It also stated that the "Matrix LS Equity Fund" (i.e. the Meridian Matrix Fund) is number 4 among the 100 performing hedge funds, as reported by Barons, and that Financial Institution A was the Meridian Long Short Equities Fund's prime broker.  Geraci knew that the information that he provided to Prospective Investor A was false as to the Meridian Matrix Fund, and he did not verify that it was true as to the Purported Matrix Fund.

77.     In approximately November 2015, Mitsakos, Geraci, and other Meridian associates began discussions with Financial Institution B, based in the United Kingdom, about offering an "actively managed certificate linked to the Matrix long short equity strategy" (the "Meridian Matrix Certificate") to prospective investors in Europe.

78.     Based upon representations Mitsakos and Geraci made regarding the Purported Matrix Fund's past performance, Financial Institution B agreed to gauge interest from investors

overseas and created a "draft" Meridian Matrix Certificate for non-U.S. investors linked to the

performance of the Purported Matrix Fund, which Geraci and Mitsakos jointly edited.

79.     Geraci and his associates agreed to fund the certificate with an initial $30 million,

and subsequently began attempting to obtain capital commitments from investors for this product

by using Matrix's unverified performance results.

80.     On December 7, 2015, Geraci sent a prospective investor by email "Info on the

[Meridian Matrix] Certificate program and the advisor."  In the email, Geraci wrote "Meridian

Asset Management has a separate Cayman based Fund of offshore investors and we have

reservation for the next $5B of the manager's capacity."  He also attached several Matrix

documents that Mitsakos had prepared, including a Matrix Newsletter reflecting monthly

performance YTD as of November 30, 2015, reflecting performance returns of 51.1% year to

date.  This Newsletter also reflected that Matrix had $60 million in AUM, that the performance

results had been audited by a well-known auditor, and that Matrix had prime brokerage

relationships with well-known firms.  Geraci had not verified any of this information before

passing it off as relevant to the Meridian Matrix Fund and he knew, recklessly disregarded,

and/or should have known that it contained material misrepresentations.

81.     Despite learning that Mitsakos had misappropriated client funds, among other red

flags about Mitsakos, Geraci and his associates continued to market the Meridian Matrix

Certificate to numerous prospective non-U.S. investors and distribute overseas the Purported

Matrix Fund's historical performance results in support of this product.

82.     For example, on February 11, 2016, Geraci wrote to a non-U.S. prospective

investor:  "I am forwarding the unique program we have set up with [Prospective Investor A] . . .

for non-US clients; allows a smaller sized client to invest with daily liquidity into a fund with

superior performance; allows the broker/advisor to be paid up front directly from [Prospective Investor A]." [sic]  He attached the draft Meridian Matrix Certificate as well as a Matrix Newsletter Mitsakos had prepared which reflected the Purported Matrix Fund's historical performance, including that it was up 51.1% in 2015.

83.     In another example, on April 27, 2016, a Meridian associate emailed a non-U.S. prospective investor, copying Geraci, three documents from Mitsakos containing numerous misrepresentations, including Matrix's unverified performance history from 2012 to 2016 YTD, that its fund structure was "one fund with $30 million under management," that the performance results had been audited by a well-known auditor, and that it had brokerage relationships with premier brokers.  Geraci knew, was reckless in not knowing, and/or should have known that each of these statements was false.

84.     By this time, Geraci knew that Mitsakos did not have a "fund," knew that Mitsakos could not verify purported past performance results, knew that Matrix had no auditor, and knew that Mitsakos' actual performance results trading in the FLCA were nowhere near those he had previously touted.  Indeed, a simple comparison of the various Matrix Newsletters Geraci had received would have shown that the historical performance results had changed and grown.  For example, a June 26, 2015 Matrix Newsletter reflected that Matrix had annual returns of 19.4 % in 2014, while the September 30, 2015 Matrix Newsletter reflected that Matrix had an annual return of 20.9% in 2014.  Similarly, one Matrix Newsletter said Matrix had $60 million in AUM, while the Matrix due diligence questionnaire for Prospective Investor A said Matrix had $30 million in AUM.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 17(a)(1), (2) and (3) of the Securities Act

85.     The Commission re-alleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 84.

86.     By engaging in the conduct described above, the Defendant, in the offer or sale of

securities, knowingly, recklessly, or negligently, by the use of means or instruments of

transportation or communication in interstate commerce or the mails, directly or indirectly:

       a.     employed devices, schemes, or artifices to defraud;

       b.     obtained money or property by means of untrue statements of material

          facts, or omissions to state material facts necessary in order to make the

          statements made, in light of the circumstances under which they were

          made, not misleading; and/or

       c.     engaged in transactions, practices or courses of business which operated or

          would operate as a fraud or deceit upon the purchaser.

87.     By engaging in the foregoing conduct, the Defendant violated and, unless

restrained and enjoined, will continue violating Section 17(a)(1), (2), and (3) of the Securities

Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c) Thereunder

88.     The Commission re-alleges and incorporates by reference herein each and every

allegation in paragraphs 1 through 84.

89.     By engaging in the conduct described above, the Defendant knowingly or

recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use

of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national

securities exchange:

   a.   employed devices, schemes, or artifices to defraud;

   b.   made untrue statements of material facts or omitted to state material facts

        necessary in order to make the statements made, in light of the

        circumstances under which they were made, not misleading; and/or

   c.   engaged in acts, practices, or courses of business which operated or would

        operate as a fraud or deceit upon any person.

90.     By engaging in the foregoing conduct, the Defendant violated and, unless

restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b) and (c)] thereunder.

### THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and (2) of the Advisers Act

91.     The Commission re-alleges and incorporates by reference herein each and every

allegation in paragraphs 1 through 84.

92.     By engaging in the conduct described above, the Defendant, while acting as an

investment adviser, by the use of the means and instrumentalities of interstate commerce and of

the mails, directly or indirectly:

   a.   employed devices, schemes, or artifices to defraud clients and prospective

        clients; and

   b.   engaged in transactions, practices, or courses of business which operated

        as a fraud or deceit upon clients and prospective clients.

22

93.     By engaging in the foregoing conduct, the Defendant violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**

94.     The Commission re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 84.

95.     By engaging in the conduct described above, the Defendant, while acting as an investment adviser to a pooled investment vehicle, has:

a.     made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to an investor or prospective investor in the pooled vehicle investment; and/or

b.     otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

96.     By engaging in the foregoing conduct, the Defendant violated, and unless restrained and enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

(a)     finding that the Defendant violated the securities laws and rules promulgated thereunder as alleged against him herein;

(b)      permanently restraining and enjoining Defendant, his agents, servants, employees and attorneys and all persons in active concert who receive actual notice of the injunction, and each of them from, directly or indirectly, violating or aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

(c)      ordering Defendant to disgorge all ill-gotten gains plus prejudgment interest thereon;

(d)      ordering Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

(e)      Granting such other and further relief as this Court may deem just and proper.


Dated:    July 17, 2018
          New York, New York

Marc P. Berger
Lara S. Mehraban
Kevin P. McGrath
Alison R. Levine
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York  10281
(212) 336-5549 (Levine)